IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RACHEL CIVITARESE, | ) | Case No. 1:19-cv-2015 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Rachel Civitarese, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12; ECF Doc. 13.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, and because any error committed by the ALJ was harmless, the Commissioner's final decision denying Civitarese's application for DIB must be affirmed.

I.    **Procedural History**

On December 14, 2016, Civitarese applied for DIB.  (Tr. 174-75).[1]  Civitarese alleged that she became disabled on February 21, 2012, due to degenerative disc disease, severe panic disorder, severe anxiety disorder, depression, and "possible bi-polar to be determined by [her]

---

[1] The administrative transcript appears in ECF Doc. 11.

therapist." (Tr. 174, 194).  She later changed the alleged onset date to April 26, 2016.  (Tr. 192).

The Social Security Administration denied Civitarese's application initially and upon

reconsideration.  (Tr. 86-115).  Civitarese requested an administrative hearing.  (Tr. 137-39).

ALJ Joseph Hajjar heard Civitarese's case on June 20, 2018 and denied the claim in a September

28, 2018, decision.  (Tr. 12-62).  On July 30, 2019, the Appeals Council denied further review,

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On September

3, 2019, Civitarese filed a complaint to obtain judicial review of the Commissioner's decision.

ECF Doc. 1.

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Civitarese was born on February 22, 1980, and she was 36 years old when she filed her

application for DIB.  (Tr. 174).  Civitarese had completed the 9th grade and got her GED.  (Tr.

195).  She had taken some college-level courses, but never completed them.  (Tr. 43).  Civitarese

had previous work as a bank teller from 2002 through 2012 and as a childcare provider from

2000 through 2003.  (Tr. 44-45).  She also had previously worked as a telemarketer, but the ALJ

determined that work was no longer relevant at the time of her application.  (Tr. 16, 44).

### B.  Relevant Medical Evidence[2]

#### 1.  Physical Health & Primary Care

In February 2012, Civitarese was admitted to the hospital after steroid injections had

failed to resolve her neck and right arm pain and an MRI showed degenerative changes in her

cervical spine.  (Tr. 383-85).  Kevin Walsh, MD, diagnosed Civitarese with cervical

---

[2] Significant portions of the medical records are duplicated throughout the administrative transcript. When this opinion references such records, it cites only the first-appearing pages for the records and omits citation to the latter-appearing duplicates.

2

radiculopathy and scheduled her for a C5-6 anterior cervical discectomy and fusion (ACDF) surgery.  (Tr. 385).  In a pre-operative evaluation, Civitarese told Steven Collier, CNP, that she her pain was worse when she rose from a seated position, lifted, twisted, or bended, but she denied having any joint pain, swelling, or muscle pain.  (Tr. 388).  Ajit Krishnaney, MD, performed the surgery on February 21, 2012, without any complications.  (Tr. 386-87).  And discharge notes from February 23, 2012, reflect that Civitarese was in stable condition, had improved range of motion in her right arm, and had spinal function within normal limits.  (Tr. 402-04).

On April 2, 2012, Lauren Wilson, PA-C, determined that Civitarese had an acute muscular flare up after she reported pain in her upper back and shoulders, which Percocet had helped.  (Tr. 380).  At follow-ups on April 13 and May 25, 2012, Civitarese told Dr. Krishnaney that she was "doing pretty well" and had some "mild" mid-cervical pain.  (Tr. 366, 379).  Dr. Krishnaney's examinations showed normal muscle tone, motor function, and gait.  (Tr. 366, 379).  Dr. Krishnaney ordered an x-ray, refilled Civitarese's Percocet prescription, and prescribed ibuprofen and Robaxin.  (Tr. 379).  In addition to treating her pain symptoms with medication, Civitarese also attended two physical therapy sessions on April 16 and 23, which Amanda Abernathy, PT, noted had allowed Civitarese to stretch well and reduce her pain levels.  (Tr. 368-69, 373-78).

On July12, 2012, Civitarese told Jaclyn Lanham, CNP, that she had begun to have radiating pain in her left arm; however, examination revealed no pain, normal gait and muscles.  (Tr. 361-63).  On July 16 and 19, 2012, Alyson Smith, MD, and Eric Mayer, MD noted that diagnostic imaging revealed mild stenosis in Civitarese's cervical spine and evidence of myelomalacia.  (Tr. 360, 420-21).  Dr. Mayer noted that Civitarese's demonstrated stiffness and

functional impairment was out of proportion to radiologic findings and speculated that her impaired range of motion might have been self-inflicted secondary to her fear and concern regarding pain.  (Tr. 360, 365).  Dr. Mayer recommended that Civitarese undertake aggressive physical therapy to improve her range of motion and gave her an epidural steroid injection for the pain on July 31, 2012.  (Tr. 358, 360, 365).

On January 12, 2015, Civitarese told Philip Dr. Gigliotti, MD, that she continued to have neck and lower back pain and weakness in her left arm, but stated that her treatment had "really helped" the pain.  (Tr. 323).  She also reported depression, which was controlled with Cymbalta.  (Tr. 323).  Examination revealed no spinal tenderness, no edema, full motor function on the right side, and 4/5 motor function on the left side.  (Tr. 325).  Dr. Gigliotti diagnosed Civitarese with cervical disc disease, lumbar disc disease, and depression.  (Tr. 325).  He continued her medications.  (Tr. 325).  At a follow-up on February 2, 2015, Dr. Gigliotti referred Civitarese to Richard Rhiew, MD, for pain management and adjusted her medications after she reported continued neck and back pain.  (Tr. 320, 322).  Civitarese also told Dr. Gigliotti that she felt more depressed, hyper, and stressed, and that her Cymbalta no longer helped.  (Tr. 320).  At follow-ups on February 16, March 9, and May 29, 2015, Civitarese reported high anxiety, depression, stress, difficulty sleeping, neck pain, and more problems with her left arm and hand.  (Tr. 308, 312, 316).  Examination again revealed no spinal tenderness, no edema, full motor function on the right side, and 4/5 motor function on the left side, and a neurologically intact gait.  (Tr. 318).  Dr. Gigliotti continued Civitarese's treatment through medications and recommended that she rest and increase fluid intake.  (Tr. 307, 311, 315).

On July 15, September 16, and November 9, 2015, Dr. Gigliotti noted that Civitarese reported continued neck and back pain, depression, and sleeping difficulty, but that oxycodone

4

helped control her pain and Cymbalta helped her mood.  (Tr. 296, 300, 304).  Examinations during this time showed tenderness in Civitarese's cervical and lumbar spine, slight weakness in her left arm and leg, symmetrical reflexes, decreased range of motion with pain in her spine, and a positive straight-leg raise on the left  (Tr. 299, 302, 307).  Dr. Gigliotti diagnosed Civitarese with chronic disc disease and cervical and lumbar radiculopathy  (Tr. 303, 307).  And he continued Civitarese's medications.  (Tr. 299, 303, 307).

On January 11, 2016, Civitarese told Dr. Gigliotti that she continued to take oxycodone regularly to control her neck and back pain, and that duloxetine and fluoxetine had not helped her depression and sleeping difficulty.  (Tr. 291).  On examination, Civitarese was in no acute distress, was oriented, had no issues in her hands, had a normal gait, and had a tender spine.  (Tr. 294).  Dr. Gigliotti switched Civitarese's pain medication to MS Contin, switched her depression medication to Effexor, and gave her a psychology referral.  (Tr. 295).  On February 23, 2016, Civitarese told Dr. Gigliotti that she felt worse, more depressed, more anxious, and more fatigued after beginning Effexor, and that her MS Contin had made her sleepy.  (Tr. 287). Examination showed no acute distress, normal gait, no hand issues, no joint swelling, and intact nerves.  (Tr. 290).  Dr. Gigliotti diagnosed Civitarese with uncontrolled depression and lumbar canal stenosis, and he adjusted her medications.  (Tr. 290).  On March 24, 2016, Civitarese reported that she had a better mood, was less depressed, and was less anxious.  (Tr. 284).  And on May 26, 2016, Civitarese said that her medications helped her back pain and therapy helped her mental symptoms.  (Tr. 281).

On June 23, 2016, Civitarese told Dr. Gigliotti that she was more depressed and anxious, and she felt "unable to do anything."  (Tr. 277). She said that she discontinued her antidepressant because insurance would not cover it, but she started taking a new one.  (Tr. 277).  Dr. Gigliotti

5

also noted that Civitarese continued to take oxycodone regularly for back and neck pain, and that examination showed tenderness and decreased range of motion in her spine.  (Tr. 277, 279).  Dr. Gigliotti continued Civitarese's medications and added Zoloft.  (Tr. 280).  At a follow-up on August 19, 2016, Civitarese told Dr. Gigliotti that Dr. Rhiew had recommended another surgery to relieve her back pain and said that she was in a "fairly good" mood.  (Tr. 273).  Her condition on examination remained generally unchanged on August 19, October 13, and December 7, 2016, and on December 7, 2016, Civitarese told Dr. Gigliotti that her therapist was considering a bipolar diagnosis.  (Tr. 263-66, 268-70, 275-76).  On January 12, 2017, Dr. Gigliotti noted that oxycodone gave Civitarese reasonable relief from her neck, back, and left arm pain, and that her mood had improved with behavioral therapy.  (Tr. 503).  She continued to have decreased range of motion and tenderness in her neck and spine and marked weakness in her left arm, and Dr. Gigliotti continued her medications.  (Tr. 505).

On January 31, 2017, Dr. Rhiew noted that Civitarese had intact strength but decreased range of motion due to pain.  (Tr. 560).  During the session, Civitarese completed a self-evaluation indicating that she had generalized muscle weakness, headaches, backaches, neck pain, limb pain, dizziness, numbness, trouble walking, pain with walking, limb weakness, depression, and anxiety.  (Tr. 562).  Civitarese also indicated that her pain was "moderate and does not vary much," she could manage her personal care, she could not lift or carry anything, she had a "great deal of difficulty in concentrating," she did not drive "hardly," and her sleep was "greatly disturbed."  (Tr. 565).

On March 6, 2017, Civitarese told Dr. Gigliotti that she had "off and on" pain in her right shoulder, and examination showed normal range of motion with crepitations and normal motor function without tenderness.  (Tr. 573, 575).  Dr. Gigliotti prescribed ibuprofen or Aleve.  (Tr.

6

575).  On April 10, May 22, July 17, and August 14, 2017, Civitarese told Dr. Gigliotti that she had no changes in her overall pain, but that her medications gave "good results," "good relief" and "good control" of her symptoms.  (Tr. 585, 666, 733, 735).  Civitarese also told Dr. Gigliotti that therapy had "really helped her anxiety and depression."  (Tr. 666).  Examinations showed decreased range of motion, weakness in her left arm, positive straight-leg raising on her left leg, tender spine and back muscles, and a normal gait.  (Tr. 587, 668, 733).  On September 8, 2017, Civitarese said that she got no relief from a recent nerve block injection.  (Tr. 728).  Civitarese also indicated that she was reluctant to undergo further surgeries and did not want to see other pain management physicians.  (Tr. 730).

On October 6, 2017, Civitarese again told Dr. Gigliotti that Dr. Rhiew suggested she undergo another surgery to treat her neck and left arm pain, and that her therapist had diagnosed her with bipolar II disorder.  (Tr. 724).  Dr. Gigliotti recommended that Civitarese follow up with a psychiatrist and continued her pain medications.  (Tr. 724, 726).  On November 3, December 1, and December 22, 2017, Dr. Gigliotti noted that Civitarese continued to have unchanged neck and back pain, her condition remained generally the same on examination, and she continued to use oxycodone for pain relief.  (Tr. 712-14, 716, 722).  Civitarese reported that her mood had generally been better with therapy, and Dr. Gigliotti noted on December 1, 2017, that she had been formally diagnosed with bipolar disorder.  (Tr. 716, 720).

On January 30, 2018, Civitarese saw Felix Dr. Nwaokafor to establish care.  (Tr. 707-11). Dr. Nwaokafor noted that Civitarese had been diagnosed with bipolar disorder, cervical spondylosis, and lumbar disc herniation.  (Tr. 707).  He also noted that Civitarese had declined a second back surgery after numerous neck and back injections were unsuccessful, and that she was comfortable using oxycodone and clonazepam to treat her conditions.  (Tr. 707).  Civitarese

reported intermittent neck spasms, arthralgias, myalgias, joint stiffness, and back pain.  But she did not have any difficulty walking.  (Tr. 707).  Examination showed "exaggerated neck stiffness and muscle tenderness," and she did not have any noted neurological symptoms.  (Tr. 707, 709).  Dr. Nwaokafor continued Civitarese's medications but decreased the frequency of her oxycodone regimen and added baclofen for her muscle spasms.  (Tr. 710).  On February 26, 2018, Dr. Nwaokafor noted that Civitarese had failed her drug screen during her previous visit, and that she had explained she ran out of medication between her two providers.  (Tr. 806).  Dr. Nwaokafor refilled her medications and directed her to use them as prescribed.  (Tr. 809).  On March 8, 2018, Civitarese told Dr. Nwaokafor that her children had noticed an onset of memory issues, but she denied any episodes of confusion.  (Tr. 801).  On examination she was alert, in no acute distress, had a normal gait, and had "slightly tender neck muscles."  (Tr. 804).  Dr. Nwaokafor ordered tests to evaluate causes of her memory issues.  (Tr. 804).

On April 8, 2018, Civitarese went to the emergency room with complaints that she had passed out, couldn't breathe, spaced out, felt like she was "in a dream," and lost consciousness.  (Tr. 777).  Civitarese denied having any pain and speculated that her episode could have been related to starting lithium and Wellbutrin.  (Tr. 777).  Lynda Boyd, MD, determined that Civitarese had a syncopal episode.  (Tr. 777).  Examination showed no decreased range of motion, pain, swelling, stiffness, tenderness, weakness, or confusion.  (Tr. 778-79).  Civitarese was also neurologically intact, alert and oriented, and had appropriate mood and affect.  (Tr. 778-79).  Dr. Boyd directed Civitarese to discontinue her lithium and Wellbutrin until she saw her primary care physician for further evaluation.  (Tr. 781).

At a follow-up on May 24, 2018, Dr. Nwaokafor noted that Civitarese had normal gait despite her reports of myalgias, and that she denied arthralgias and joint stiffness.  (Tr. 856, 859).

8

Dr. Nwaokafor continued Civitarese's medications and directed her to "[f]ollow a healthy diet and exercise regularly."  (Tr. 860).

### 2.     Mental Health

On April 26, 2016, Marnee Graham, LPC, evaluated Civitarese for mental health counseling.  (Tr. 458-70).  Civitarese reported that she felt depressed, lacked energy, had trouble staying motivated and interested in activities, felt anxious, had difficulty concentrating and finishing tasks, was very forgetful, had panic attacks, and had sudden mood changes.  (Tr. 458).  Examination showed average demeanor, clear speech, euthymic mood, full affect, no thought content problems, and no behavior or cognition issues.  (Tr. 461).  Graham determined that Civitarese's "moderate" symptoms caused serious impairments in her family relations, socialization, thinking, and mood, but not in her work.  (Tr. 462).  Graham diagnosed Civitarese with generalized anxiety disorder and persistent depressive disorder, referred her for behavior health counseling with CPST, and stated that no other supports were necessary at the time.  (Tr. 462-63).

From July 29, 2016, through June 7, 2018, Civitarese saw Mercedes Bryjak, LPCC, for 38 counseling sessions.  (Tr. 330-38, 627-30, 654-55, 685-90, 692-701, 752-69, 794-99, 828-33, 836-43).  Bryjak's notes show that, over the course of her treatment, Civitarese's mental condition fluctuated.  (Tr. 330-38, 627-30, 654-55, 685-90, 692-701, 752-69, 794-99, 828-33, 836-43).  For example, Bryjak reported that Civitarese had made "great progress" in reducing her depression and anxiety, managing her time, and coping with her emotions on: (1) November 1 and 15, 2016; January 3 and 17, May 12, September 27, October 25, and December 6, 2017; and January 16, 2018.  (Tr. 332-33, 629-30, 654, 692, 695, 698, 761).  But she also reported increased anxiety, depression, withdrawal, irritability, and fatigue on November 29 and

December 20, 2016; February 14, 2017; and January 29, 2018.  (Tr. 330-31, 628, 765).  On April

11, 2017, Civitarese cried during her session and "grieved [her] loss of quality of life" due to her

stress, anxiety and "deep depression."  (Tr. 627).  On October 11, 2017, Bryjak discussed the

possibility of a bipolar diagnosis with Civitarese, and Civitarese reported hypomanic episodes on

November 17 and 22, 2017.  (Tr. 693-94, 697).  On January 19, 2018, Bryjak wrote a letter to

Civitarese's attorney indicating that Civitarese was awaiting psychiatric evaluation to determine

whether she had bipolar II disorder.  (Tr. 670).  On June 7, 2018, Bryjak discussed with

Civitarese skills to cope with managing her mood during hypomanic episodes and managing

ADHD symptoms.  (Tr. 842).  Throughout her treatment, Bryjak consistently noted that

Civitarese was able to stay engaged in her therapy sessions, participate well, and make progress

toward her treatment goals and in developing skills to cope with her depression and anxiety.  (Tr.

330-38, 627-30, 654-55, 685-90, 692-701, 752-69, 794-99, 828-33, 836-43).

On February 1, 2018, Civitarese told Natajlia E. Benn, CNP, that she was having a manic

episode and had stopped taking her medications because she "always felt tired and [the

medications] seemed not to work."  (Tr. 679).  Civitarese reported that she was easily frustrated

and angered, was never able to complete goals that she set, "wander[ed] aimlessly in the house,"

and had trouble sleeping.  (Tr. 679).  Examination showed a stable gait and station, fluent

speech, and racing and disorganized thoughts.  (Tr. 680).  Benn diagnosed Civitarese with

generalized anxiety disorder, dysthymic disorder, and bipolar II disorder.  (Tr. 683).  Benn

prescribed Wellbutrin and Abilify and directed Civitarese to continue with therapy.  (Tr. 682).

On March 28, 2018, Civitarese again reported that she was having a manic episode and had

stopped taking her medications.  (Tr. 794).  Benn noted that Civitarese had racing thoughts and

had bloodwork done to evaluate causes for possible short-term memory loss.  (Tr. 794).  On

examination, Benn determined that Civitarese had intact recent and remote memory, and she had normal attention/concentration. (Tr. 796). Benn adjusted Civitarese's medication and directed her to continue with therapy. (Tr. 797).

### C. Relevant Opinion Evidence

#### 1. Treating Physician – Felix Nwaokafor, MD

On February 2, 2018, Dr. Nwaokafor completed a medical source statement. (Tr. 705-06). Dr. Nwaokafor opined that Civitarese could occasionally lift up to 10 pounds and frequently lift up to 5 pounds due to chronic neck and back pain, which surgery had failed to resolve. (Tr. 705). Dr. Nwaokafor said that Civitarese could stand/walk for up to 5 hours in a workday and half an hour at a time and explained that had "minimal impairment in the lower extremities." (Tr. 705). Her impairments did not affect her ability to sit, but she: (1) rarely climb, stoop, crouch, push, or pull; (2) occasionally balance, kneel, crawl, and perform gross manipulation; and (3) frequently reach and perform fine manipulation. (Tr. 705-06). Dr. Nwaokafor said that Civitarese was restricted from heights, moving machinery, and temperature extremes because they might aggravate her pain. (Tr. 706). Civitarese had no need for a assistive ambulation or breathing devices. (Tr. 706). But she needed to be able to alternate positions between sitting, standing, and walking at will and needed to be able to elevate her legs to 45 degrees at will. (Tr. 706). Dr. Nwaokafor indicated that Civitarese's pain was "moderate," and when asked if the pain caused any limitations Dr. Nwaokafor circled "yes" but left blank the check-boxes for limitations such as impaired concentration, off-task behavior, and absenteeism. (Tr. 706). Nevertheless, Dr. Nwaokafor indicated that Civitarese would need one hour of additional breaktime beyond customary scheduled breaks. (Tr. 706).

### 2.      Treating Counselor – Mercedes Bryjak, LPCC

On December 20, 2016, Mercedes Bryjak, LPCC, completed a source statement indicating that Civitarese could frequently: use judgment; relate to coworkers; interact with supervisors; function independently without redirection; understand, remember, and carryout simple job instructions; and maintain her appearance.  (Tr. 327-28).  She could occasionally follow work rules; maintain attention and concentration for extended 2-hour segments; respond appropriate to changes in routine settings; deal with the public; work in coordination with or proximity to others without being distracting; understand, remember, and carry out complex and detailed instructions; socialize; behave in an emotionally stable manner; relate predictably; manage funds and schedules; and leave home on her own.  (Tr. 327-28).  Civitarese could rarely maintain regular attendance; be punctual; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 327).  In the margins of the source statement, Bryjak wrote that Civitarese received counseling for "dysthymia, anxiety and possible bipolar II disorder," and that she was "awaiting psychiatric evaluation to address the above diagnos[es] on [a] medical level."  (Tr. 670).

On February 12, 2018, Bryjak completed another source statement, indicating that Civitarese had mild impairments in: following 1 or 2 step instructions; asking and answering questions; providing explanations; cooperating with others; asking for help; stating her own point of view; responding to requests and criticism; initiating and performing tasks; working with others without interrupting or distracting them; distinguishing between acceptable and unacceptable performance; being aware of hazards; and taking precautions.  (Tr. 703-04).  She had moderate impairments in: understanding and learning instructions and procedures;

describing work activity; recognizing and correcting mistakes; identifying and solving problems; sequencing multi-step activities; using reason and judgment; handling conflicts with others; responding to demands; adapting to changes; setting realistic goals; and making independent plans. (Tr. 703-04). And she had marked or extreme impairments in: keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; working at an appropriate and consistent pace; completing tasks in a timely manner; sustaining ordinary routine and regular attendance; working a full day without needing extra breaks; and managing her own psychologically based symptoms. (Tr. 703-04). Bryjak explained that Civitarese had "frequent [and] intense mood changes that interfere[d] with [her] ability to manage emotions, presence, and stress." (Tr. 704).

Less than one month later, on March 5, 2018, Bryjak completed a third source statement making the following changes to her February opinion. (Tr. 774-75). Civitarese had moderate impairments in: following 1 or 2 step instructions; asking and answering questions; cooperating with others; asking for help; stating her own point of view; responding to requests and criticism; initiating and performing tasks; working with others without interrupting or distracting them; distinguishing between acceptable and unacceptable performance; being aware of hazards; and taking precautions. (Tr. 774-75). And she had marked or extreme impairments in: sequencing multi-step activities; handling conflicts with others; ignoring or avoiding distractions; responding to demands; and adapting to changes. (Tr. 774-75).

On June 12, 2018, Bryjak wrote a letter to Civitarese's attorney, stating that Civitarese had been diagnosed with generalized anxiety disorder, dysthymic disorder, and bipolar II disorder, and that the conditions affected her "ability to manage mood, emotional output and

behavior.  It also impacts [Civitarese's] ability to pursue employment and maintain work demands."  (Tr. 845).

### 3.    State Agency Consultants

On February 8, 2017, Ann Prosperi, DO, evaluated Civitarese's physical functions based on a review of the medical record.  (Tr. 90, 92-93).  Dr. Prosperi determined that Civitarese had the medically determinable impairment of "spinal disorders," and that her symptoms included pain, loss of sensation, weakness, sustained concentration and persistence limitations, social interaction limitations, and ability to adapt limitations.  (Tr. 90, 92).  Dr. Prosperi stated that Civitarese's statements concerning her limitations – that she had flares making her unable to use her left arm, had degenerative disc disease, had decreased range of motion in her neck, had decreased strength in her left arm, took strong medication for her pain, and had depression and anxiety which improved somewhat with medication and therapy – were consistent with the medical evidence.  (Tr. 92).  Dr. Prosperi opined that Civitarese had the residual functional capacity ("RFC") to perform sedentary work, except that:

> she can lift/carry 10 pounds occasionally, stand/walk 2 hours, and sit 6 hours with a sit/stand option every hour for 5 minutes.  She can balance, and occasionally climb stairs/ramps, but not ladders, ropes, or scaffolds.  She can occasionally stoop, kneel, crouch, crawl, and frequently reach in front.  She can occasionally reach overhead.  She cannot push or pull with the left upper extremity, but she can handle, feel, and finger.  The claimant is precluded from hazards and extreme cold.

(Tr. 93).  Dr. Prosperi noted that her RFC assessment was an adoption of the RFC from the August 2015 ALJ decision pursuant to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997).  (Tr. 93).  On April 25, 2017, Sreenivas Venkatachala, M.D., concurred with Dr. Prosperi's opinion with the following exceptions: (1) Civitarese could frequently lift and carry

up to 10 pounds; and (2) she would need to avoid exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation.  (Tr. 106-08).

On February 9, 2017, state psychologist Paul Tangeman, Ph.D., evaluated Civitarese's medication condition based on a review of the medical record.  (Tr. 90-91, 93).  Dr. Tangeman determined that Civitarese had the medically determinable impairments of "depressive, bipolar and related disorders" and "anxiety and obsessive-compulsive disorders."  (Tr. 90).  Dr. Tangeman determined that the impairments caused moderate limitations in: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, and maintaining pace; and (4) adapting or managing herself.  (Tr. 91).  Dr. Tangeman stated that Civitarese:

> can perform simple routine tasks with simple, short instructions, make simple decisions, have few workplace changes, and is limited to superficial interaction with coworkers, supervisors, and the public.

(Tr. 93) (noting that the limitations were adopted from the RFC assessment in the August 2015 ALJ decision pursuant to *Drummond*).  On April 20, 2017, Katherine Reid, Psy.D., determined that Civitarese was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) responding appropriately to changes in the work setting. (Tr. 104-05, 109-11).

### D.      Relevant Testimonial Evidence

Civitarese testified at the ALJ hearing.  (Tr. 41-54).  Civitarese testified that she drove, but only around her hometown (Parma) after she had been in three car wrecks that she attributed to her limited neck mobility.  (Tr. 42-43).  Civitarese said that, in a typical day, she would wake up, do laundry if she felt mentally alright, walked to the end of her street to pick up her son from the bus stop, and lay around.  (Tr. 47).  She said that she did not keep up with the housework and barely cooked.  (Tr. 47).  Civitarese said that she only had a decent mental health day once a week, and that she had recently had a bad manic episode that made her feel exhausted.  (Tr. 48). She said that she had difficulty concentrating on things like getting up, preparing food for her son, emptying the dishwasher, walking upstairs, or taking a shower because she did not have the energy.  (Tr. 49).  Civitarese said that she often did not complete tasks she started and she did not like being in public or around other people because it made her feel "panicky."  (Tr. 49). Civitarese said that she talked to her dad often when he called her, and that she had only one friend.  (Tr. 50).

When asked what had changed since her previous ALJ hearing, Civitarese testified that she continued to have "a lot of pain" due to her cervical disc herniation and she sometimes was not able to move for hours, days, or weeks at a time.  (Tr. 45-46).  She also said that she "finally" sought mental health treatment and was diagnosed with bipolar disorder, which caused sleeping and memory issues.  (Tr. 46).  Civitarese said that she had racing thoughts, felt panic-stricken, and was "all over the place;" or she would feel "down and low" without any energy.  (Tr. 51). Sometimes Civitarese would be angry about "the littlest things," which would cause her to be "nasty" to other people – including throwing a basket or lamp at one of her children.  (Tr. 53).

16

Millie Droste, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 54-61).
The ALJ directed the VE to consider prior relevant work experience as a head bank teller and
child care provider.  (Tr. 55).  The VE determined that the bank teller position was heavy work
as performed based on Civitarese's testimony that she had to lift coin boxes that could weigh
more than 50 pounds, and her work as a childcare provider was medium work because she had to
lift toddlers or infants who could weigh over 20 pounds.  (Tr. 55-58).

The ALJ asked the VE what work a hypothetical individual with Civitarese's age,
education, and work experience could perform if she were limited to sedentary work with the
following limitations:

> This individual can – requires a sit/stand option every hour for five minutes.  This
> person cannot push and pull with the left upper extremity.  This individual can
> occasionally reach overhead to the left and to the right and can frequently reach in
> all other directions bilaterally.  So, occasional reaching overhead bilaterally and
> frequent reaching in all, in all other directions bilaterally.  This person can only
> occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds.
> This person can only occasionally stoop, kneel, crouch, and crawl.  This person
> can never work near moving mechanical parts and cannot engage in commercial
> driving; this person, also, can never work at unprotected heights.  Moreover, this
> person is limited to simple, routine tasks with simple, short instructions; is limited
> to simple work-related decisions; can tolerate superficial interactions with
> supervisors, co-workers, and the public; and can tolerate few workplace changes.

(Tr. 58-59).  The VE testified that such an individual could not perform any of Civitarese's past
work because that work was over the exertional level of the hypothetical.  The VE opined that
the hypothetical person could work as an addresser, document preparer, or stuffer for toys.  (Tr.
59).  The ALJ asked if the individual for the first hypothetical could perform work if she were
additionally "limited to perform[ing] simple, routine tasks.  This person . . . can tolerate
occasional interactions with supervisors and co-workers and the public.  This person can tolerate
occasional workplace changes."  (Tr. 59-60).  The VE testified that such an individual could
perform the same jobs previously identified.  (Tr. 60).  Further, the ALJ testified that the

17

individual described in the second hypothetical could perform the same work if she were additionally "limited to no strict production rate pace requirements" because sedentary work is not production-rate work.  (Tr. 60).  The VE also testified that absenteeism of one day per month and off-task behavior exceeding 10% of the workday would be work-preclusive.  (Tr. 61).

## III.    The ALJ's Decision

The ALJ's September 28, 2018, decision found that Civitarese was not disabled and denied her claim for DIB.  (Tr. 15-27).  The ALJ noted that Civitarese had filed a previous application for DIB in June 2012, which ALJ Traci Hixson had denied after a hearing on August 21, 2015.  (Tr. 15); *see also* (Tr. 66-75) (August 21, 2015 ALJ decision).  The ALJ noted that the prior claim was still pending before this court at the time of the September 2018 decision.  (Tr. 15).  Further, the ALJ stated:

> The unders[ig]ned has looked back to the previous ALJ decision to consider *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), and *Dennard v. Secretary of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990).  The Commissioner of Social Security has acquiesced to these decisions respectively in Acquiescence Rulings 98-4(6) and 98-3(6).

> Explained further into the decision, the undersigned adopts the previous ALJ residual functional capacity determination because the updated evidence did not change the determination.

(Tr. 15).  Further, the ALJ noted that, because Civitarese's "date last insured" was December 31, 2017, she was required to show that her disability arose on or before that date.  (Tr. 16).

The ALJ determined that Civitarese had the severe impairments of "degenerative disc disease; depression; and anxiety."  (Tr. 18).  But she did not have any impairments, singly or in combination, that met or medically equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18).

After a "careful consideration of the entire record," the ALJ determined that Civitarese had the RFC to:

> Perform sedentary work, meaning she can lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently as defined in 20 CFR 404.1567(a) except, she cannot push or pull with the left upper extremity. She can sit for six hours in an eight-hour workday. She can stand and walk for two hours in an eight-hour workday. She needs the option to sit or stand for five minutes every hour. She can occasionally reach overhead bilaterally, and frequently do all other reaching bilaterally. She can never climb ladders, ropes, and scaffolds. She can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. She cannot work at unprotected heights, around moving mechanical parts, engage in commercial driving, or work in extreme cold. She can perform simple and routine tasks with simple short instructions. She can make simple work related decisions. She can have superficial interactions with supervisors, co-workers, and the public. She can tolerate few workplace changes.

(Tr. 20). In evaluating Civitarese's RFC, the ALJ expressly stated that he "considered all symptoms" in light of the medical and other evidence. (Tr. 20). The ALJ specifically discussed Civitarese's own statements about her condition but determined that her subjective complaints regarding the "intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record." (Tr. 21).

The ALJ exhaustively discussed physical health and primary care evidence in the record, including Dr. Gigliotti's notes indicating that Civitarese consistently reported having chronic neck and back pain that radiated into her left arm, had slightly reduced left arm strength, had decreased range of motion in her left arm and spine, and used oxycodone to control her pain symptoms. (Tr. 21-22). He also noted that Civitarese had reported depression and anxiety to Dr. Gigliotti, but that she had appeared to be in good spirits with medication in September 2015, said she had an improved mood and less depression in March 2016, and reported benefits from therapy and medication in May 2016. (Tr. 21). Further, the ALJ noted that, in March 2017, Civitarese had told Dr. Gigliotti that she had right shoulder pain, but examination showed normal

19

range of motion with crepitus, normal motor strength, and no tenderness.  (Tr. 22).  The ALJ also noted that Dr. Rhiew had diagnosed Civitarese with "failed back syndrome," cervical disc herniation, and stenosis after she had a discectomy fusion and four steroid injections that did not relieve her pain.  (Tr. 21-22).  Further, the ALJ noted that Dr. Rhiew found that Civitarese had progressively worse back pain that was aggravated by turning her neck and all range of motion. (Tr. 22).  Finally, the ALJ noted that Dr. Nwaokafor's 2018 physical examinations all indicated that Civitarese's condition was within normal limits.  (Tr. 22).

The ALJ also summarized Civitarese's mental health treatment, including that she received therapy approximately two times a month after April 2016, was cooperative during her therapy sessions, had no cognitive impairments, and was consistently found to have made progress.  (Tr. 22).  The ALJ noted that Civitarese was diagnosed with bipolar II disorder in January 2018, which caused her to be easily frustrated and angered.  (Tr. 22) And he noted that she had a few reported flare-ups in her mental health symptoms due to spine pain and reported that she stopped taking her medication in February 2018.  (Tr. 22).  The ALJ further noted that there was some mention of ADHD symptoms in the record.  (Tr. 22).

The ALJ also noted that he considered the medical opinion evidence, including the opinions by the state agency consultants, Counselor Bryjak, and Dr. Nwaokafor.  (Tr. 22-25). The ALJ explained that he gave each of Bryjak's opinions "some weight" because she had given little-to-no explanation for the individual limitations identified, the treatment relationship was too short when she issued her December 2016 opinion, she did not specifically set out the limitations in her 2018 opinions, the marked and extreme limitations discussed in the February 2018 opinion were inconsistent with medical records showing only moderate functional limitations, and she was not an acceptable medical source.  (Tr. 23-24).

20

The ALJ also stated that he gave "partial weight" to Dr. Nwaokafor's opinion.  (Tr. 23).

The ALJ specifically explained that:

> The evidence shows that on January 30, 2018, Dr. Nwaokafor initially examined the claimant.  She was a former patient of Dr. Gigliotti.  He indicated the clamant had been followed by neurosurgery in the past and that she had declined a second back surgery.  She also attended counseling sessions.  It was noted the claimant had intermittent neck spasms.  She also had back pain that traveled down her legs with occasional tingling and numbness.  The claimant presented documents that indicated she was awarded disability.  The physical examination showed exaggerated neck stiffness and muscle tenderness.  Her gait was normal.  She was diagnosed with cervical spondylosis, lumbar disc herniation, and cervical disc herniation.  The claimant continued prescribed Oxycodone and Baclofen was added.  Her prescription for Sertraline was stopped and she was prescribed Clonazepam.

(Tr. 23-24) (citation omitted).

> Additionally, the ALJ noted that the August 21, 2015, ALJ decision had found:

> severe impairments of degenerative disc disease of the cervical spine, lumbar spine disc herniation, depression, and anxiety.  The claimant had the residual functional capacity for sedentary work, meaning she could lift/carry 10 pounds occasionally, stand/walk 2 hours, and sit 6 hours with a sit/stand option every hour for 5 minutes.  She could balance, and occasionally climb stairs/ramps, but not ladders, ropes, or scaffolds.  She could occasionally stoop, kneel, crouch, crawl, and frequently reach in front.  She could occasionally reach overhead. She cannot push or pull with the left upper extremity, but she could handle, feel, and finger.  The claimant was precluded from hazards and extreme cold.  She could perform simple routine tasks with simple, short instructions, make simple decisions, have few workplace changes, and was limited to superficial interaction with coworkers, supervisors, and the public.

(Tr. 22-23).  The ALJ explained that he adopted the RFC from the 2015 decision pursuant to *Drummond* because the updated evidence did not show a change in Civitarese's functional capacity.  (Tr. 23).  Further, the ALJ stated that he gave "great weight" to the state agency consultants' opinions.  (Tr. 23).

Because the ALJ found that Civitarese was unable to perform her past relevant work and lacked the ability to perform all or substantially all of the requirements of sedentary work, the

21

ALJ relied on VE testimony to determine whether Civitarese was able to perform any work in the national economy.  (Tr. 25-27).  Based on the VE's testimony, the ALJ found that someone with Civitarese's age, experience, and RFC could "perform the requirements of representative occupations such as Addresser, Document Preparer, [or] Stuffer."  (Tr. 26) (citations omitted).  In light of his findings, the ALJ determined that Civitarese was not disabled from April 26, 2016 (the alleged onset date) through December 31, 2017 (the date last insured).

## IV.   Law & Analysis

### A.   Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion upon fresh review or if the evidence could have supported a different conclusion.  42 U.S.C. § 405(g); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is

not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    *Drummond* Doctrine

Civitarese argues that the ALJ erred in adopting the RFC finding from ALJ Hixson's 2015 decision pursuant to *Drummond* because her application did not involve the narrow factual circumstances to which *Drummond* applies. ECF Doc. 15 at 15-17. Specifically, Civitarese asserts that *Drummond* only required adoption of a prior ALJ decision when the application involved the *same* time period. ECF Doc. 15 at 16. And, because Civitarese's December 2016 application involved a new time period, the ALJ was required to evaluate all the evidence in the record anew – including a fresh examination of the evidence that was considered in the 2015 decision. ECF Doc. 15 at 16-17.

The Commissioner argues that the ALJ did not simply apply *Drummond* and ignore the additional evidence in the record. ECF Doc. 17 at 10. The Commissioner asserts that the ALJ properly took a fresh look at the new evidence in the record, was mindful of the past ruling, found that the new evidence did not show changed circumstances, and concluded that Civitarese retained the same RFC that ALJ Hixson had found. ECF Doc. 17 at 10. Further, the Commissioner contends that the ALJ did not ignore any relevant evidence, but adequately

considered evidence from the relevant time period – the April 26, 2016 onset date though the December 31, 2017 last-insured date.  ECF Doc. 17 at 10-11.

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond*, 126 F.3d at 842.  In that case, the claimant's initial claim for SSI was denied when an ALJ found that the claimant retained an RFC for sedentary work.  *Id.* at 838.  When the claimant later re-filed her disability claim, a second ALJ found that the claimant had an RFC suitable for medium-level work and denied the re-filed claim.  *Id.* at 839.  After explaining that "[r]es judicata applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound by the RFC findings of the first ALJ because there had been no new or additional evidence of an improvement in the claimant's condition.  *Id.* at 841-42 ("Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.").  In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98-4(6).  The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level.  It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> When adjudicating a **subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim**, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98-4(6) (S.S.A.), 1998 SSR LEXIS 5 (1998) (emphasis added) (footnote omitted).

The Sixth Circuit later observed that the "[u]nusual facts" in *Drummond* had led to an overstatement the principles of *res judicata* involved in subsequent applications under the Social Security Act.  *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018).  The court clarified that *res judicata* barred only successive litigation of *the same claim*, and that a subsequent claim alleging a later onset date and disability period was *not the same claim*.  *Id.* ("Sure as we're born, we age.  Sometimes we become sick and sometimes we become better as time passes.  Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date.").  Thus, when a new application seeks benefits for a distinct period of time, the application is entitled to fresh review.  *Id.*

Nevertheless, the Sixth Circuit further clarified that "[f]resh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Id.* at 934.  And, although the earlier decision is not binding on the ALJ, "the prior factual finding was 'such an important and probative fact" that, absent new evidence showing a change in the claimant's condition, a later finding to the contrary could be unsupported by substantial evidence.  *Id.*  Therefore, the Sixth Circuit concluded that "it is fair" for an ALJ to consider an earlier ALJ's decision and the record before that ALJ to honor the principles of "[f]inality, efficiency, and the consistent treatment of like cases."  *Id.* at 933.

At first glance, it is easy to see why Civitarese believes that the ALJ improperly applied *Drummond* in her case.  We need look no farther than this: the ALJ expressly stated that he was

following *Drummond* by adopting ALJ Hixson's 2015 RFC determination.  (Tr. 15, 22-23).  And the court agrees that *Drummond* does not control because the claim before ALJ Hajjar alleged a later onset date and sought benefits for a different time period.  *Earley*, 893 F.3d at 933-34. Nevertheless, this court reviews whether the ALJ *applied proper legal standards*, not whether the ALJ provided *proper legal citations*.  *Cf.* 42 U.S.C. § 405(g).  Thus, the Court's analysis does not end simply because the ALJ said he followed *Drummond*.

A review of the record and ALJ decision reveals that, despite incorrectly citing *Drummond*, the ALJ properly applied the correct legal standards in a manner consistent with the Sixth Circuit's decision in *Earley*.  Here, the ALJ considered the prior ALJ determination as evidence occupying persuasive space in the context of the entire record, including the objective medical and opinion evidence.[3]  (Tr. 20-25).  And such treatment is precisely what *Earley* indicated an ALJ should do when reviewing a subsequent application alleging a new period of disability.  893 F.3d at 933-34.  Further, the record does not show that the ALJ improperly applied *Drummond* by concluding that the prior RFC finding had issue-preclusive effect. Notably, the ALJ never indicated that the prior RFC finding was binding, or that he was "required to" or "must" adopt it.  *See generally* (Tr. 15-27).  Instead, the ALJ merely stated that he adopted the prior RFC finding because the new evidence in the record did not show a change in Civitarese's condition.  (Tr. 15, 22-23).  The ALJ was allowed to make that decision.  Nothing in *Earley* prohibits adoption of a prior RFC finding.  *See generally Early*, 893 F.3d at 930-35. Indeed, such adoption falls within the spirit of *Earley*'s proposition that "the prior factual finding was 'such an important and probative fact'" that, absent new evidence showing a change in the

---

[3] The ALJ actually seated his discussion of the prior RFC finding in the context of evaluating the weight due to the state agency consultant's opinions.  *See* (Tr. 22-23).

claimant's condition, a later finding to the contrary could be unsupported by substantial evidence.  *Id.* at 934.

Even if this court were to conclude that the ALJ improperly applied *Drummond* (he did not) or that the ALJ's citation to *Drummond* resulted in a failure to draw an accurate and logical bridge sufficient to ensure the claimant understood his reasoning (it might have), the error would nevertheless be harmless.  *Rabbers*, 582 F.3d at 654.  When reviewing for harmless error, the court must look to whether the error "'prejudiced [the claimant] on the merits or deprived [her] of substantial rights.'"  *Id.* (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  The ALJ's decision to adopt the prior RFC determination did not deprive Civitarese of a substantial right.  Here, the substantial right that improper application of *Drummond* might interfere with is the right to fresh review of the application for benefits.  *See Earley*, 893 F.3d at 933-34.  And the ALJ provided fresh review by considering all the evidence (including the prior RFC decision) in the record before him, assessing Civitarese's RFC in light of that evidence, and considering whether, in light of Civitarese's RFC and other characteristics, she was able to perform work available in the national economy.  (Tr. 15-27); *Earley*, 893 F.3d at 933-34.

Civitarese also was not prejudiced by the ALJ's decision to adopt the previous RFC finding or to refer to *Drummond*.  *Rabbers*, 582 F.3d at 654.  Prejudice typically results when the absence of a legal error might have led to a different result.  *See Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  Here, the court is not convinced that the result would have been any different had the ALJ not cited *Drummond* or expressly adopted the prior RFC.

28

The ALJ exhaustively reviewed all the evidence in the record and concluded that the new evidence did not establish greater limitations than those found in the 2015 RFC.  And nothing in the record leads this court to conclude that the ALJ would have made a different RFC finding had he ignored the previous RFC finding.  Moreover, the ALJ's analysis – which, as discussed above, actually applied the standards set out in *Earley* – would likely have been the same had the ALJ substituted his citation to *Drummond* for a citation to *Earley* or the *Drummond-Earley* doctrine.

Because the ALJ got to the correct end point required by the *Drummond-Earley* line of cases in deciding to adopt the previous RFC finding – and because any error in doing so or in how his opinion was expressed was harmless – Civitarese's first challenge to the ALJ's decision must be rejected.

### C.        Conclusion that RFC Did Not Change

Related to her *Drummond* argument, Civitarese argues that the ALJ erred in finding that there was no evidence showing that her condition had worsened since the 2015 decision.  ECF Doc. 15 at 18.  Civitarese asserts that she had new evidence that she had been diagnosed with bipolar disorder in  February 2018, and that the ALJ's decision ignored that evidence.  ECF Doc. 15 at 18.  Civitarese contends that, had the ALJ adequately considered evidence – such as Bryjak's opinions finding "marked" and "extreme" limitations based on Civitarese's psychological condition and testimony that she had "frequent and intense mood swings" – the ALJ would have found that she was disabled.  ECF Doc. 15 at 18.

The Commissioner responds that the ALJ adequately considered all the evidence in the record, including Civitarese's bipolar disorder diagnosis, her testimony, Nurse Benn's assessment, and Bryjak's notes and opinion.  ECF Doc. 17 at 11-13.  Further, the Commissioner

asserts that the ALJ expressly stated that he gave Bryjak's opinion only "some weight," and that Civitarese has not challenged that decision.  ECF Doc. 17 at 13.  The Commissioner also argues that, because substantial evidence supported the ALJ's assessment of the evidence and RFC determination, this court should defer to the ALJ's decision.  ECF Doc. 17 at 13.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.  And, as *Earley* implicitly made clear, an ALJ reviewing a subsequent application for benefits alleging a distinct period of disability, may not simply ignore new evidence, but must instead consider it in the context of the entire record.  *See Earley*, 893 F.3d at 933-34.

The ALJ applied proper legal standards in concluding that Civitarese's RFC had not changed and in adopting the ALJ Hixson's 2015 RFC finding.  Here, the ALJ complied with the regulations and *Earley* by explicitly considering all of Civitarese's impairments – severe or otherwise – in light of the objective medical evidence, medical opinions, testimony, and previous ALJ decision.  20 C.F.R. §§ 404.1520(e), 404.1529(a); SSR 96-8p, 1996 SSR LEXIS 5; *Earley*, 893 F.3d at 933-34; (Tr. 20-25).  The ALJ did not simply ignore any of the medical evidence in the record but gave a detailed summary of Civitarese's primary care and mental health treatment

by Dr. Gigliotti, Dr. Rhiew, Dr. Nwaokafor, Nurse Benn, and Ms. Bryjak.  (Tr. 20-22).  This discussion included express mention of the fact that "a certified nurse practitioner" had diagnosed Civitarese with bipolar II disorder in January 2018, and that Civitarese's bipolar symptoms included being "easily frustrated and angered," "flares due to spine pain," periods during which Civitarese stopped taking medication, and possible ADHD symptoms.  (Tr. 22).  Moreover, the ALJ adequately discussed Bryjak's notes and opinions in evaluating her RFC in 11 paragraphs spanning four pages of the 6-page RCF evaluation.  (Tr. 22-25).  And, despite Civitarese's assertion that Bryjak's opinions would have supported a more-limited RFC, she has not challenged the ALJ's decision to give Bryjak's opinions only "some weight."  *See* ECF Doc. 15 at 18; (Tr. 23-25).

Substantial evidence also supported the ALJ's decision to adopt the same RFC finding that ALJ Hixson articulated in the 2015 decision.  Here, the ALJ concluded that, during the relevant period (April 2016 through December 2017) Civitarese had mental functional limitations that precluded her from working around hazards, performing more than simple and routine tasks with simple instructions, making more than simple work-related decisions, having more than superficial interactions with others, and tolerating more than few workplace changes.  (Tr. 20).  Notwithstanding Civitarese's 2018 bipolar diagnosis and notes indicating that the onset of the disorder might have occurred as early as December 2016, substantial evidence supported the ALJ's conclusion that additional limitations beyond those included in the 2015 RFC finding were not necessary, including: (1) Bryjak's treatment notes regularly indicating that Civitarese had made progress with therapy; (2) Civitarese's statements to other providers that she had improved with therapy and medications; (3) Graham's notes that Civitarese had no cognitive, behavioral, or thought-content issues in April 2016; (4) notes indicating that Civitarese's manic

31

episodes had occurred during periods in which she was not medication-compliant; and (4) an examination after Civitarese complained of possible memory issues beginning in 2018 showed that she had intact recent and remote memory and normal attention/concentration.  (Tr. 273, 281, 284, 295-96, 300, 304, 503, 666, 679, 716, 720, 794, 796).  And, although Civitarese has not specifically challenged the physical function aspects of the ALJ's RFC decision, substantial evidence also supported the ALJ's decision not to include greater physical function limitations, including: (1) notes indicating that Civitarese maintained an intact gait, full motor function in the right arm, and 4/5 motor function in the left arm (with only slight or mild weakness); (2) Civitarese's own statements that medication (oxycodone) helped control her pain symptoms; (3) Civitarese's refusal to undergo additional surgeries to correct her spinal pain; (4) Dr. Gigliotti's March 2017 notes indicating that Civitarese had normal range of motion with crepitations and normal motor function without tenderness; (5) Dr. Boyd's April 2018 examination showing no decreased range of motion, pain, swelling, stiffness, tenderness, or weakness; and (6) Dr. Nwaokafor's May 2018 recommendation that Civitarese exercise regularly.  (Tr. 277, 279, 281, 290, 294, 296, 299-300, 302, 304, 307, 318, 503, 573, 575, 585, 587, 666, 668, 680, 707, 712-14, 716, 722, 730, 733, 735, 778-79, 860).  Thus, the ALJ's decision that the new evidence did not demonstrate a change in Civitarese's condition to warrant limitations beyond those in the 2015 RFC determination was reasonably drawn from record and was not the result of the ALJ's decision to ignore evidence.

### D.    Treating Physician Opinion

Finally, Civitarese argues that the ALJ failed to apply proper legal standards determining that Dr. Nwaokafor's opinion was due only "partial weight."  ECF Doc. 15 at 19-21.  Civitarese asserts that the ALJ erred by failing to discuss the various limitations in Dr. Nwaokafor's opinion

with any specificity or indicate which limitations he credited and which he rejected.  ECF Doc. 15 at 20.  Further, Civitarese contends that the ALJ's cursory review of Dr. Nwaokafor's opinion was especially problematic because treatment notes and diagnostic testing supported Dr. Nwaokafor's statements that she was limited to "rare pushing/pulling, limited to occasional gross manipulation, needed to be able to sit/stand at will, needed to elevate her legs 45 degrees while seated, and required an extra hour of breaks each day.  ECF Doc. 15 at 20-21.  Civitarese argues that the ALJ's error in weighing Dr. Nwaokafor's opinion was not harmless because, had the limitations in that opinion been incorporated into the RFC, full time work would have been precluded.  ECF Doc. 15 at 21.

The Commissioner responds that Dr. Nwaokafor might not have been a "treating physician" within the meaning of the Social Security Act because his initial examination of Civitarese occurred in January 2018 – after Civitarese's date last insured (December 31, 2017). ECF Doc. 17 at 13-15.  Nevertheless, the Commissioner contends that even if Dr. Nwaokafor was a treating physician, the ALJ applied proper legal procedures and reached a conclusion supported by substantial evidence in determining that his opinion was due only "partial weight." ECF Doc. 17 at 14-17.  The Commissioner argues that the ALJ provided sufficient explanation for discounting Dr. Nwaokafor's opinion because it was: (1) conclusory; and (2) inconsistent with his own notes indicating that Civitarese had only intermittent neck spasms, occasional tingling and numbness, exaggerated neck stiffness and muscle tenderness, and a normal gait. ECF Doc. 17 at 15.  Further, the Commissioner asserts that the ALJ appropriately accommodated any limitations supported by objective evidence in the RFC by finding that Civitarese could perform only a reduced range of sedentary work.  ECF Doc. 17 at 15.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). But inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary

requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion.  *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. § 404.1527(d)(2) (and § 416.927(d)(2)) require the ALJ to articulate good reasons for the ultimate weight given to a medical opinion).  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'"  (citing *Rogers*, 486 F.3d at 243)).

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining

physician's opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375.

An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining

opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to

address whether an ALJ erred in failing to give good reasons for not accepting non-treating

physicians' opinions).

   As an initial matter, it is questionable whether Dr. Nwaokafor's opinion was relevant at

all to the ALJ's analysis of whether Civitarese had a disability beginning on or before December

31, 2017.  This is because an ALJ is required to consider a medical opinion issued after the date

last insured only to the extent that the limitations provided therein relate back to the period

predating the last-insured date.  *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849-50 (6th

Cir. Mar. 19, 2020).  And, when such an opinion does relate back to the relevant period, the

opinion of a physician whose treatment relationship did not begin until after the relevant period

is not entitled to any deference under the treating physician rule.  *See Jirousek v. Comm'r of Soc.

Sec.*, No. 1:16-cv-1221, 2017 U.S. Dist. LEXIS 72836, at *62 (N.D. Ohio, May 12, 2017)

("Since there was no established treatment relationship prior to the date last insured, Jirousek has

not demonstrated that Dr. Perhala's opinion would be entitled to controlling weight under the

treating physician rule.").  Beginning with the limited relevance of post-relevant period opinions

in mind, the fatal stroke for Civitarese's challenge is Dr. Nwaokafor's failure to say anything in

his two-page opinion indicating whether the limitations therein were based on her condition

before December 31, 2017, or her condition on February 2, 2018 – the date Dr. Nwaokafor

issued his opinion.  *See* (Tr. 705-06); *Emard*, 953 F.3d at 850 (holding that an ALJ did not err in

giving "little weight" to a treating physician opinion that was issued in 2017 when the last-

insured date expired in September 2015 and the opinion did not point to specific limitations

during the insured period).  Simply put, because Dr. Nwaokafor did not treat Civitarese until January 2018, did not issue his opinion until February 2018, and did not provide any information indicating that the functional limitations in the opinion arose by or before December 31, 2017, this court is unable to conclude that Dr. Nwaokafor's opinion was relevant to Civitarese's claim. *See Emard*, 953 F.3d at 850 ("This principle has been repeatedly embraced by prior decisions of this court.  In *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230 (6th Cir. 1993), for instance, this court discounted evidence from a treating source offered after the date last insured where the evidence . . . contained 'no reference' to the claimant's condition during the insured period.").  And, because Dr. Nwaokafor's opinion did not relate back to the relevant period, the ALJ was not required to consider it at all.  *See Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 477 (6th Cir. 2018) ("Post-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date."); *Emard*, 953 at 850-51.[4]

Even if the ALJ was required to consider and weigh Dr. Nwaokafor's opinion and if we assume the opinion related back to the insured period, the ALJ nevertheless applied proper legal standards and reached a decision supported by substantial evidence in deciding to give it only "partial weight."  Here, the Commissioner is correct that Dr. Nwaokafor's opinion was not entitled to special deference under the treating physician rule.  Because Dr. Nwaokafor did not treat Civitarese until *after* the insured period had expired, he was at most a non-examining physician concerning opinions that dealt with Civitarese's condition before her date last insured. *See Jirousek v. Comm'r of Soc. Sec.*, No. 1:16-cv-1221, 2017 U.S. Dist. LEXIS 72836, at *62

---

[4] Arguably, in light of the above discussion, the ALJ might have technically erred by not first considering whether Dr. Nwaokafor's opinion related back to the relevant opinion.  Nevertheless, such an error would be harmless because Civitarese could only benefit, and could not be prejudiced, by the ALJ's decision to consider Dr. Nwaokafor's opinion.  *See Rabbers*, 582 F.3d at 654.

(N.D. Ohio, May 12, 2017) ("Since there was no established treatment relationship prior to the date last insured, Jirousek has not demonstrated that Dr. Perhala's opinion would be entitled to controlling weight under the treating physician rule.").  And the ALJ was not required to articulate "good reasons" for rejecting Dr. Nwaokafor's opinion.  *Smith*, 482 F.3d at 876. Instead, the ALJ complied with the regulations by considering Dr. Nwaokafor's opinion and assigning it only "partial weight" because Dr. Nwaokafor did not examine Civitarese until January 2018, and his notes revealed that she had "exaggerated neck stiffness and muscle tenderness," declined a second surgery, had a normal gait, and controlled her symptoms with therapy and medication.  (Tr. 23-24).  A review of Dr. Nwaokafor's notes supports these findings.  (Tr. 707-10, 801-09, 856, 859-60).

Because Dr. Nwaokafor's opinion did not relate back to the relevant insured period, the ALJ was not required to consider it or give it any deference, and any error in discounting the opinion was harmless.  Further, to the extent the ALJ was required to consider Dr. Nwaokafor's opinion as relating to the relevant period, that opinion was not entitled to any deference because it was at most a non-examining physician's opinion. The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in discounting it.

## V.    Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, and because any error committed by the ALJ was harmless, the Commissioner's final decision denying Civitarese's application for DIB is affirmed.

**IT IS SO ORDERED.**

Dated: July 30, 2020

Thomas M. Parker
United States Magistrate Judge

38